17828UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GREGORY HALLEE, | : | |
|     Plaintiff | : | Civ. Act. No. |
| | : | |
| v. | : | |
| | : | |
| | : | JURY TRIAL DEMANDED |
| UNIVERSITY OF CONNECTICUT; | : | |
| GEORGE T. KRAUS | : | |
|     Defendants | : | JANUARY 10, 2012 |
| | : | |

## **COMPLAINT**

Plaintiff Greg Hallee (hereinafter "Plaintiff" and/or "Hallee") brings this action against the University of Connecticut (hereinafter "Defendant", "Defendants" and/or "UCONN") and individually against his former supervisor George T. Kraus (hereinafter "Defendants" and/or "Kraus") seeking money damages and other legal and equitable remedies against said Defendants for unlawfully discriminating against him on account of his freedom of speech on matters of public concern and retaliating against him pursuant to 42 U.S.C. § 1983, the First Amendment of the Connecticut and United States Constitution.  Plaintiff alleges he was unlawfully retaliated against pursuant to Conn. Gen. Stat. 31-51q, the Connecticut Constitution, on account of his exercising his freedom of speech regarding a matter of public concern.  In addition, Plaintiff seeks common law damages for intentional infliction of emotional distress.

**I.     PARTIES**

1.     Hallee is a resident of the State of Connecticut, having his principal residence in Colchester, Connecticut.

2.     Defendant UCONN is a State University, having a place of business at 352 Mansfield Road, Unite 2048, Storrs, Connecticut 06269.

3.     Defendant Kraus is an individual and was employed by Defendant UCONN as Hallee's immediate supervisor during all relevant time periods. Kraus supervised and controlled Hallee's terms, conditions and privileges of employment.  Kraus is a resident of the State of Connecticut, having his principal residence in Mansfield, Connecticut.

## II.     JURISDICTION AND VENUE

4.     Jurisdiction over the subject matter of this litigation exists under 42 U.S.C. § 1983.  As to Plaintiff's common law claims, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

5.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (2), as the unlawful conduct complained of herein took place within the District of Connecticut and both parties reside in the District.

## III.    STATEMENT OF FACTS

6.     Hallee was employed by the Defendant as a Principal Electrical Engineer, from 2006 to the date of his constructive discharge on April 8, 2011, when he was forced to take a disability leave of absence for an exacerbation of his Parkinson's disease condition resulting from the hostile and retaliatory work environment created by the Defendant and his immediate supervisor George Kraus.

7.     Hallee alleges herein that he made repeated attempts to save Connecticut taxpayers money by complaining in good faith to the have work performed by his department instead of being performed by outside contractors at a high expense. Hallee complained to management

without success, as the Defendant and Kraus repeatedly hired outside firms to perform the work at greater expense to the Connecticut taxpayers. Hallee's complaints to management involved a matter of public concern, that Connecticut taxpayers have a right to pay less for work being performed at higher expense by third party contractors which could be or had been performed by personnel in Hallee's department. On information and belief, Defendant and Kraus used favored outside contractors to perform the wasteful work that Hallee's department could perform.  In response, the Defendant and Kraus created and subjected Hallee to a hostile work environment and retaliation for his engagement in his protected activity.  Eventually, Hallee was constructively discharge and forced to take a disability leave due to the hostile work environment which caused an exacerbation of his Parkinson's disease condition.

8. Prior to making complaints to the Defendant and Kraus to have work performed by Hallee's department, he had been previously recognized by other employees as a person who seeks to save the Defendant and the taxpayer money.

9. On April 15, 2007, Captain Michael McGovern, Fire Marshal with the Defendant's Division of Public and Environmental Health, wrote to Hallee's supervisor, stating in pertinent part as follows: "…due to his knowledge of the construction industry, and prudent negation, he has saved the University upwards of $400,000 for these projects, which represents roughly 2 million dollars, without compromising safety provided by or the quality of the systems. In other words, form my humble perspective, Mr. Hallee has conducted himself in the way a property owner's representative should, with a focus on quality and financial prudence, ensuring that the University gets what it pays for."

10. On April 28, 2008, Ron Gaudet, Energy Services Manager, sent an email to Comisiak, Hallee's supervisor, stating, [b]y doing the job internally we have been able to offer the

university the ability to do the job quickly and for a much lower cost than if the job were to be done with external resources. Greg never questions helping out when we call with questions that stump us and always adds valuable insight."

11. On April 29, 2008, Dave Koehler, Defendant's Academic Renovations, sent a letter to Comisiak stating, "Greg has been very helpful overall, including working with us to keep costs down, and he has provided design information to our group in a timely manner."

12. On April 23, 2009[1], Hallee received a performance rating of outstanding regarding the performance of his job duties. Hallee received a salary increase and performance merit awards.

13. On February 5, 2010, the architectural engineering staff coordinated by Hallee submitted an unsolicited proposal for RFP project number 012110 LM to develop Engineering Design Standards in an attempt to save the Defendant and the Connecticut taxpayers' over $500,000 in fees paid to an outside consulting firm the Defendant and Kraus were attempting to hire. Plaintiff's proposal stated, the Architectural and Engineering Department staff "are willing to perform this work seeking only compensatory time as payment…[t]his work would be done at half the cost, produce a better product, and be completed on a quicker, fast-track schedule."

14. On February 8, 2010, Annie Noonan, of the UCPEA union representing the Architectural Engineering staff ("AES), e-mailed Jim Bradley and other UCONN management stating that AES had submitted this proposal and requested to schedule a meeting with the staff and management.

15. On February 9, 2010, UCONN Vice President Barry Feldman responded to the union's e-mail asking Melanie Savino to arrange a meeting. (Barry Feldman was Jim Bradley's boss. Jim Bradley was George Kraus's boss.)

---

[1] Hallee also received an outstanding performance review rating in 2007 and 2008.

16. On February 10, 2010, Ms. Noonan sent an e-mail to all parties trying to coordinate a meeting. Shortly thereafter, Hallee's current boss at the time, Kathy Comisiak, informed him that Jim Bradley and George Kraus were **furious** that the AES staff, including Hallee, was not conforming to the management plan to outsource the development of the engineering design standards. Comisiak said Hallee should talk to Bradley and Kraus.

17. On or about February 11, 2010, Hallee then went into a closed-door meeting with Kraus and Jim Bradley. Hallee stated his department could do the work for half of the cost and it would save the Defendant and taxpayers a substantial amount of money. However, Defendant and Kraus preferred to outsource the project to an outside firm at a substantially increased cost to taxpayers. During the meeting, Kraus and Bradley both threatened to make Hallee's life miserable if he did not stop pursuing the issue immediately.

18. On February 14, 2010, out of fear of losing his job, Hallee wrote Feldman an e-mail stating, "I would like to assure you that we submitted our proposal to help write the new UCONN engineering standards with honest and good intentions of saving the University time and money while producing a superior product. We believe that we could utilize our strong relationship with the facilities group to accomplish this task. I met with both Kathy Comisiak, Jim Bradley, and George Kraus to assure them of this…I would like to meet with you without any union in a non-confrontational meeting to clarify our intentions and clear up any confusion."

19. On February 15, 2010, Jim Bradley responded back stating "it is Hallee's recommendation that we meet together prior to any further action regarding meeting with Barry Feldman".

20. On April 21, 2010, Kraus and Bradley wrote an email to Hallee regarding his work performed in 2009 through early 2010 on the West Hartford UCONN campus electrical

switchgear project. Kraus and Bradley had previously approved Hallee's work on the project. On January 6, 2010, Hallee obtained a quote based on his design for the new switchgear, which was ordered with the approval of Kraus and Bradley. In the email, Kraus and Bradley stated, "this project as currently envisioned will not go forward if under AES management or assuming any AES responsibility." This was a retaliatory action against Hallee for his prior complaint involving a public concern related to the project number 012110 LM to develop Engineering Design Standards.

21.     On April 21, 2010, Anthony Weston, Defendant's Regional Camus Director, sent an email to Bradley, stating that Hallee had already designed the project and the equipment was specified, ordered and scheduled for delivery. Weston specifically stated, "I also want to add that I feel that Greg's design is better and more thorough than CL&P's was." Kraus and Bradley sabotaged Hallee's work and needlessly wasted Connecticut taxpayers' money when it approved a contract in the amount of $126,500 awarded to BVH Integrated Services, Inc. to perform the identical work Hallee had already completed, specified parts for and arranged for pre-purchase and delivery. Later, Kraus continually accused Hallee in numerous public meetings that he was responsible for the delay and cost overrun on the project, which is false.

22.     On April 28, 2010, Hallee received an outstanding performance review from Comisiak. Clearly, his complaints of outsourcing did not interfere with his relationship with his employer. Hallee received a salary increase and performance merit awards.

23.     Around June of 2010, UCONN started interviewing candidates for Jim Bradley's VP position.  As it appeared Jim was not going to be selected for the position, Jim Bradley left the University shortly thereafter.

24.     Around October of 2010, Kathy Comisiak left the University out of frustration and took another position at a different university.

25.     When Comisiak left in October of 2010, Kraus became Hallee's boss and immediately continued to subject Hallee to a hostile work environment.   Kraus also continued to retaliate against Hallee.

26.     In a chain of e-mails starting from February 7, 2011 through March 25, 2011. The following sequence of events occurred.  David Avery, who is the emerging technologies librarian at UCONN, requested Hallee's services in designing some additional power outlets at the library on level 3.  In requesting Hallee's services, Avery stated "Greg has managed this project twice before and it ran very smoothly. We want to do the same thing as before".  Kraus continually responded saying "No - I don't think so". The fact was that Hallee was available and ready to do the project but Kraus would not let him.  On February 10, 2011, Kraus stated "it has to be done professionally and go out to bid. He is also going to be tasked to support the Stanford library work."  The truth was Hallee was never asked to do the Stanford library work.  On March 25, Kraus stated "too bad we didn't start hiring a firm when this came up."  Hallee complained to the Defendant and Kraus that the work should be performed by his department in order to save a substantial amount of money, instead Kraus decided to hire an outside vendor to do the work.

27.     On November 4, 2010, Kraus sent an email retaliating against Hallee after Hallee requested confirmation about the Atwater main breaker project that he had no knowledge he was assigned to perform.  Kraus stated, "this has been on your list for some time. Don't try to play dumb. Would be happy to prioritize your work."

28.     On November 15, 2010, Kraus sent a similar retaliatory email stating in pertinent part, "if you want me to direct your every hour of the day, let me know."

7

29.     On December 14, 2010, there is an e-mail documenting the fact that Kraus took a West-Hartford electrical project away from Hallee and gave it to another outside consultant by the name of BVH.  This was another blatant example of retaliatory retribution tactics by UCONN management against Greg Hallee at the expense of wasting the Connecticut state taxpayers' money.

30.     On January 10, 2011, Hallee attended a meeting with other personnel including Kraus and John Warner.  Warner raised his voice to Hallee regarding electrical issues for job #2010-06 Gant IT. When Hallee attempted to respond to Warner, Kraus yelled at Hallee, "shut up". Kraus then stated Hallee produces "shoddy design". He stated to Warner in front of Hallee, "Don't worry, I'm going to take care of Greg." The statement was retaliatory and formed part of the hostile work environment Hallee experienced. The statement was also a direct statement of discriminatory intent on the part of Kraus.

31.     In various weekly meetings Hallee attended along with other personnel, including Kraus, Kraus motioned with his cell phone that he was punching a cartoon character (smart phone application) called "Talking Tom" until the cartoon character was knocked out. Kraus then stated, "when Greg makes me mad, I hit the character instead of hitting Greg." This was a direct statement evidencing Kraus' intent to create a hostile work environment and retaliate against Hallee for complaining about wasting taxpayers' money unnecessarily outsourcing projects.

32.     In two separate meetings attended by Hallee, Kraus held up his finger to the sensor on the cell phone and said "I watch my blood pressure rise whenever I talk to Greg." This was a direct statement evidencing Kraus intent to create a hostile work environment and retaliate against Hallee for complaining about wasting taxpayers' money by unnecessarily outsourcing projects.

33. On January 25, 2011, Hallee attended a meeting with other personnel including Kraus. During the meeting, Kraus canceled three West Hartford projects (Trecker, Chiller, AHU). Kraus stated it was better to have an outside consultant design it even though Hallee and another employee had already completed most of the design. Kraus then berated Hallee, "I'm having a good day! I canceled three of your projects." This was a direct statement evidencing Kraus' intent to create a hostile work environment and retaliate against Hallee for complaining about wasting taxpayers' money unnecessarily outsourcing projects.

34. On March 8, 2011, Hallee received an e-mail directing him to hand over work that could have been done by in-house UCONN AES people to another UCONN consulting firm by the name of DTC on a project for the HBL data center. This was another blatant example of retaliatory retribution tactics by UCONN management against Hallee at the expense of wasting the Connecticut state taxpayers' money. At a meeting the same day, Kraus berated Hallee when he asked him what projects he was working on, even though Kraus took away almost all of his projects. The statement was retaliatory and formed part of the hostile work environment Hallee experienced.

35. On March 15, 2011, Hallee attended a meeting with other personnel including Kraus. Kraus publicly humiliated Hallee again when he stated, "it's a good thing Greg is sitting at the front of the table with me so I can stop him from sleeping through the meeting like he did last week." Kraus then stated, "if I had my phone with me, I would take your blood pressure." The statement was retaliatory and formed part of the hostile work environment Hallee experienced.

36. On March 17, 2011, Hallee gave Kraus a letter from his treating neurologist stating that he had been diagnosed with Parkinson's Disease on August 2007. However, Hallee alleges on

information and belief that Kraus and the Defendant regarded him as having a physical disability, as he had continually exhibited problems associated with Parkinson's disease.

37.     On March 29, 2011, Hallee attended a meeting with other personnel including Kraus. Kraus publicly humiliated Hallee again when he accused him of not working on the ice rink projected, "here is an electrical project Greg has done nothing on." Kraus had not yet notified Hallee he was responsible for the project. The statement was retaliatory and formed part of the hostile work environment Hallee experienced.

38.     On April 4, 2011, Hallee attended a meeting along with other personnel including Kraus. Hallee began to discuss the development of group metrics and Kraus spontaneously interrupted, "we don't want to track individual people like Greg Hallee and his punctuality for showing up for the meeting on time." The statement was retaliatory and formed part of the hostile work environment Hallee experienced.

39.     On April 6, 2011, there is another documented e-mail showing that Kraus directed Hallee to handover the work that Hallee could have done himself and partially did himself to more outside consultants by the name of JCJ and VanZelm. This was another blatant example of retaliatory retribution tactics by UCONN management and Kraus against Hallee at the expense of wasting the Connecticut state taxpayers' money.

40.     On April 6, 2011, there is an e-mail documenting Hallee handing over his design drawings of Atwater electrical work to another outside consultant by the name of VanZelm per the direction of UCONN management. This was another blatant example of retaliatory retribution tactics by UCONN management and Kraus against Greg Hallee at the expense of wasting the Connecticut state taxpayers' money.

41. On April 7, 2011, during a meeting attended by Hallee and other personnel, Kraus picked up a piece of unplugged computer cable and held it up in the air and said, "we can send Greg to BICSI and it will take him a week to learn how to plug this cable in." The statement was retaliatory and formed part of the hostile work environment Hallee experienced.

42. On April 8, 2011, Hallee was forced to take a disability leave of absence due to an exacerbation of his Parkinson's disease which was directly and proximately caused by the Defendant's and Kraus' unlawful conduct.

43.  On May 10, 2011, Hallee received an outstanding performance review from the Defendant. Clearly, his complaints of outsourcing did not interfere with his relationship with his employer. Hallee received a salary increase and performance merit awards.

44. On November 1, 2011, Hallee was constructively discharged by the Defendant and Kraus when he had to take a disability retirement.

### IV.     COUNT ONE:     WRONGFUL DISCHARGE CLAIM UNDER 42 U.S.C. SECTION 1983

45. Paragraphs 1-44 are hereby incorporated by reference the same as if fully pleaded in Count One.

46. Plaintiff alleges that he was wrongfully discriminated against in the terms and conditions of his job because he exercised his freedom of speech, under the United States and Connecticut Constitutions, when he spoke out about a matter of public concern to the Defendant and Kraus. Defendant is a state actor because it is a state university.  Kraus was at all relevant times and employee of the Defendant and Hallee's immediate supervisor.

47. Plaintiff was further constructively discharged because the Defendant and Kraus created

a work atmosphere so intolerable that he was forced to file for disability retirement. The Defendant and Kraus acted with the specific intent to force Plaintiff to take a disability leave of absence and eventually take a disability retirement. No similarly situated reasonable employee would be able to withstand such mistreatment and remain employed.

48. 42 U.S.C. Section 1983, the First Amendment of the United States Constitution and Connecticut Constitution make it illegal for an employer to discipline or discharge an employee because such employee exercised his freedom of speech rights on behalf of the public regarding matters of public concern.

49. As alleged herein, Plaintiff was exercising his freedom of speech in reporting and opposing the fraudulent business practices by the Defendant and Kraus. Such opposition was on behalf of the citizens in Connecticut, and implicated a matter of public concern.

50. Plaintiff's exercise of his freedom of speech rights did not substantially or materially interfere with his bona fide job performance or with his working relationship the Defendant and Kraus. The Defendant and Kraus rated Plaintiff's employment as outstanding during all relevant time periods.

51. The close timing alone of Plaintiff's hostile work environment and forced disability retirement, let alone the pretextual reason provided by the employer, makes it absolutely clear that he was adversely treated for his having exercised his freedom of speech.

52. As a result of the Defendant's and Kraus' unlawful actions, Plaintiff was and continues to be adversely affected and has suffered substantial damages.

**V.   COUNT TWO:      RETALIATION CLAIM UNDER 42 U.S.C. SECTION 1983**

53. Paragraphs 1-52 are hereby incorporated by reference the same as if fully pleaded in Count Two.

54. Plaintiff alleges that he was wrongfully retaliated against and forced to take disability retirement by the Defendant and Kraus because he exercised his freedom of speech, under the United States and Connecticut Constitutions, when he spoke out about a matter of public concern to the Defendant. Defendant is a state actor because it is a state university. Kraus was at all relevant times and employee of the Defendant and Hallee's immediate supervisor.

55. 42 U.S.C. Section 1983, the First Amendment of the United States Constitution and the Connecticut Constitution make it illegal for an employer to discipline or discharge an employee because such employee exercised his freedom of speech rights on behalf of the public on matters of public concern.

56. As alleged herein, Plaintiff was exercising his freedom of speech in reporting and opposing the fraudulent business practices that he witnessed to the Defendant and Kraus. Such opposition was on behalf of the citizens in Connecticut, and implicated a matter of public concern.

57. Plaintiff's exercise of his freedom of speech rights did not substantially or materially interfere with his bona fide job performance or with his working relationship the Defendant and Kraus. The Defendant and Kraus rated Plaintiff's employment as outstanding or better.

58. The close timing alone of Plaintiff's hostile work environment and forced disability retirement, let alone the pretextual reason provided by the employer, makes it absolutely clear that he was adversely treated for his having exercised his freedom of speech.

59. As a result of the Defendant's and Kraus' unlawful actions, Plaintiff was and continues to be adversely affected and has suffered substantial damages.

### VI.    COUNT THREE:    RETALIATION AND WRONGFUL TERMINATION CLAIM UNDER CONNECTICUT GENERAL STATUTES SECTION 31-51q

60.    Paragraphs 1-59 are hereby incorporated by reference the same as if fully pleaded in Count Three.

61.    Plaintiff alleges that he was wrongfully retaliated against and forced to take disability retirement by the Defendant and Kraus because he spoke out about a matter of public concern to the Defendant and Kraus.

62.    Plaintiff was further constructively discharged because the Defendant and Kraus created a work atmosphere so intolerable that he was forced to file for disability retirement. The Defendant and Kraus acted with the specific intent to force Plaintiff to take a disability leave of absence and eventually take a disability retirement. No similarly situated reasonable employee would be able to withstand such mistreatment and remain employed.

63.    Section 31-51q of the Connecticut General Statutes makes it illegal for an employer to discipline or discharge an employee because such employee exercised his freedom of speech rights on behalf of the public as guaranteed under the federal or state constitutions.

64.    As alleged herein, Plaintiff was exercising his freedom of speech, as protected by the above state statute, in reporting and opposing the fraudulent business practices. Such opposition was on behalf of the citizens in Connecticut, and implicated a matter of public concern.

65.    Plaintiff's exercise of his freedom of speech rights did not substantially or materially interfere with his bona fide job performance or with his working relationship the Defendant and Kraus. The Defendant and Kraus rated Plaintiff's employment as satisfactory or better.

66.    The close timing alone of Plaintiff's hostile work environment and forced disability retirement, let alone the pretextual reason provided by the employer, makes it absolutely clear

that he was adversely treated for his having exercised his freedom of speech.

67. As a result of the Defendant's and Kraus' unlawful actions, Plaintiff was and continues to be adversely affected and has suffered substantial damages.

## VII. COUNT FOUR: PENDENT CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

68. Paragraphs 1-67 are hereby incorporated by reference the same as if fully pleaded in Count Four.

69. The unlawful employment actions alleged herein were the direct result of the Defendant's and Kraus' actions to intentionally inflict emotional distress, or that Defendant and Kraus knew or should have known that such distress was a likely result of their conduct.

70. Hallee's allegations of employment discrimination and retaliation caused by the Defendant and Kraus was so extreme and outrageous as to offend the common decency of any similarly situated individual in his position.  No employee should be subjected to a material change in their terms, conditions and privileged of employment based on their protected activity to speak on matters of public concern as alleged herein.

71. The Defendant and Kraus possessed knowledge that the employment discrimination alleged herein directly violated the Defendant's own employment policies, but did nothing to remedy each and every violation.

72. Plaintiff has experienced severe emotional and psychological injuries as a direct and proximate cause of the Defendant's and Kraus' actions. He has trouble sleeping, eating, experiences stress, depression, cognitive dysfunction and anxiety. Most important, the Defendant's and Kraus' unlawful employment actions have caused an exacerbation in his Parkinson's disease.

73.     On August 10, 2011, Plaintiff was evaluated and diagnosed with major depression and an adjustment disorder with mixed emotional features caused by the stress of his working environment.

74.     As a result of Defendant's and Kraus' conduct, Plaintiff has suffered and will continue to suffer past and future economic, physical and emotional harm.

**WHEREFORE**, Plaintiff is seeking:

1.      Compensatory damages, including loss of enjoyment of life, emotional pain and suffering, back pay, bonuses, and the value of all other employment benefits in an amount to be determined by the trier of fact, with interest from the date when said sums were due against all Defendants;

2.      Compensatory and Punitive damages pursuant to 42 U.S.C. § 1983 et.seq. against all Defendants;

3.      A money judgment representing compensatory and punitive damages for the Defendants willful violations of Conn. Gen. Stat. Section. 31-51q;

4.      Common law punitive damages against all Defendants;

5.      Award attorneys fees against all Defendants;

6.      Prejudgment interest and costs against all Defendants;

7.      An injunction permanently enjoining the Defendants, their agents, employees, successors, assigns and all persons who acted in concert and participation with the Defendants, from engaging in any employment practice which discriminates and retaliates on the basis of freedom of speech;

8.	An Order that the Court retain jurisdiction over this action until the Defendants have fully complied with the Orders of this Court and that the Court require the Defendants to file such reports as may be necessary to supervise such compliance;

9.	A money judgment to recoup any tax loss suffered by Plaintiff as a result of receiving a lump sum award of back pay and front pay rather than having received wages over a period of years;

10.	Such other and further relief as this Court shall deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff respectfully requests a jury trial on all questions of fact raised by his complaint.

> PLAINTIFF,
> GREG HALLEE
>
> By: /s/ Mark P. Carey
> Mark P. Carey (ct17828)
> Mark P. Carey, P.C.
> Attorneys At Law
> 71 Old Post Road, Suite One
> Southport, CT 06490
> (203) 255-4150 tel.
> (203) 255-0380 fax.
> Mcarey@capclaw.com
> His Attorney